[No. 9577.   Department Two.   December 16, 1911.]

*In re* WESTLAKE AVENUE, SEATTLE.[1]

NAVIGABLE WATERS—BRIDGES—RIGHT TO ERECT—FEDERAL CONSENT —POLICY. The secretary of war having consented to the erection of a temporary bridge across the Lake Washington canal, the same to be "removed or rebuilt when the work of constructing the canal may render such action necessary," the city has power to build a permanent bridge at that point upon complying with required conditions, under 30 Stats. at L. 1151, providing that structures may be built under authority of the legislature of the state across waterways wholly within the limits of the state when the location and plans therefor have been approved by the chief of engineers and secretary of war, and Rem. & Bal. Code, §§ 7868, 7869 in harmony therewith, in view of the settled policy of the Federal government to allow local authorities to select the location for such bridges, subject to the approval which was given; it not being contemplated that the Federal government might subsequently arbitrarily refuse to approve the location of a proper bridge at that place.

MUNICIPAL CORPORATIONS—IMPROVEMENTS — ASSESSMENTS — BENE-FITS — CONTEMPLATED IMPROVEMENTS — BRIDGES. Upon the improvement of a street crossing a navigable waterway in contemplation of the erection of a bridge, raising the grade to make proper approaches for the bridge which would be useless for any other purpose, property abutting on the streets may be assessed for the benefits that will accrue by subsequently constructing the bridge, although not yet provided for, where the bridge is an essential part of the improvement and will materially benefit the property, and the evidence shows that the bridge will be erected at that place.

SAME—ASSESSMENTS—PROPERTY SUBJECT—EASEMENTS— RAILROAD FRANCHISE. Where a railroad company has a mere easement or right of way to maintain tracks in a street, it cannot be assessed for benefits from the improvement of the street, required to be assessed against abutting property benefited thereby; especially where its franchise compelled it to make a substantial cash contribution towards the expense of the improvement.

Appeal from a judgment of the superior court for King county, Albertson, J., entered January 11, 1911, confirming an assessment roll for the improvement of streets, after a trial before the court without a jury. Affirmed.

[1]Reported in 119 Pac. 798.

*Carkeek & McDonald* and *Victor M. Place*, for appellants, contended, among other things, that the commissioners could not consider benefits from the construction of a bridge which was not included within the improvement. *Hutt v. Chicago,* 132 Ill. 352, 23 N. E. 1010; *Chicago v. Kemp,* 240 Ill. 56, 88 N. E. 284; *Kansas City v. St. Louis & S. F. R. Co.,* 230 Mo. 369, 130 S. W. 273, 28 L. R. A. (N. S.) 669.

*Scott Calhoun* and *William B. Allison,* for respondent.

CROW, J.—This is an appeal from an order confirming an assessment levied for the improvement of Fremont and West-lake avenues, in the city of Seattle. Westlake avenue is one of the principal thoroughfares of Seattle, and extends for a considerable distance in a northerly direction immediately west of Lake Union, with its northern terminus at the U. S. government ship canal. Fremont avenue, another thoroughfare and practically a continuation of Westlake, extends from the north side of the canal in a northerly direction. The improvement involved the grading of Fremont and Westlake avenues, and also the widening of a portion of the latter. The city, by Ordinance No. 22,817, enacted December 27, 1909, granted to the Northern Pacific Railway Company a perpetual right of way, thirty feet in width, over the easterly side of Westlake avenue. On October 29, 1902, the acting secretary of war approved a map of location and plans for a bridge across the canal connecting Fremont and Westlake avenues, and delivered to the city the following written permit:

"Whereas, By section 9 of an act of Congress approved March 3, 1899, entitled 'An act making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes,' it is provided that bridges, dams, dikes, or causeways may be built under authority of the legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by

the chief of engineers and by the secretary of war before construction is commenced;

"And whereas, The board of public works of the city of Seattle, Washington, having authority of the legislature of the state of Washington to construct a bridge across the Lake Washington ship canal right of way at Fremont in said state, has submitted a map of the location and plans of the same, which have been approved by the chief of engineers;

"Now, therefore, this is to certify that the map of location and plans of said bridge, which are hereto attached, are hereby approved by the secretary of war, subject to the following conditions:

"(1)    That the engineer officer of the United States army, in charge of the district within which the bridge is to be built, may supervise its construction, in order that said plans shall be complied with.

"(2)    That said bridge shall give a clear opening in the direction of the axis of the canal not less than seventeen and one-half (17½) feet wide.

"(3)    That said bridge shall be removed or rebuilt whenever the work of constructing the canal may render such action necessary."

Attached to this permit is a map designated: "Plan showing location of proposed bridge across an arm of Lake Union near Fremont, Seattle, Washington, accompanying application of the city of Seattle under date of April 1st, 1902." The bridge was built and continued in use for several years. On September 17, 1906, notice to remove it and other bridges in aid of the construction of the canal, together with suggestions to be considered by the city of Seattle in adopting plans for rebuilding, was transmitted to the chairman of the board of public works, by H. M. Chittenden, major of the corps of engineers of the United States army, by letter of that date, in which he in part said:

"The provisional authority granted by the secretary of war on April 29, 1902, for construction of a crossing at Fremont avenue contains the following: 'That said bridge shall be removed or rebuilt whenever the work of constructing the canal may render such action necessary.' . . . The

time has now arrived when it is necessary for the government to take advantage of its rights under the deed of right of way, and the conditions in permits granted since the date of condemnation proceedings, and to require the removal of the bridges above referred to. Application for permission to erect new structures, if accompanied by the necessary maps and plans, will be entertained, and to assist in the preparation of such plans the following conditions approved by the chief of engineers U. S. army, are specified, which it will be necessary for the structures to conform to: . . ."

Then follows a detailed statement of required conditions. Thereafter Ordinance No. 17,629 of the city was approved, which provided for the laying off, extending, and establishing Westlake avenue, from the south line of Mercer street to the south line of the Lake Washington canal, and of Fremont avenue from the north line of the Lake Washington canal to Ewing street, for changing and establishing the grades thereof, for condemning, taking and damaging necessary property, for grading approaches, and for an assessment on property benefited. Ordinance No. 22,458,

"Providing for the improvement of Westlake avenue from Mercer street to Fremont avenue, and of Fremont avenue from the intersection of Westlake avenue north, Nickerson street, and Fourth avenue north (at the canal) northward across the government canal . . . by grading and filling said avenues to the elevation established by Ordinance No. 17,629 . . ."

was approved on March 1, 1910. This ordinance, with much detail, directed the improvement, created a local improvement district, provided that the cost and expense should be defrayed by assessments on property within the district, and also provided:

"That the plans and specifications of the bridge or roadway upon that portion of the avenue crossing the government canal shall be of such plan and design and of such width and of such character as the United States engineers may require and permit; . . . that the Northern Pacific Railway Company shall pay into the city treasury to the

credit of the local improvement district herein created the
sum of thirty thousand dollars ($30,000) in accordance
with the terms and provisions of Ordinance No. 22,817; and
provided further, that the Northern Pacific Railway Com-
pany shall also pay into the city treasury to the credit of
the local improvement district herein created, a sum of money
equal to one-fifth (1-5) of the total cost of said improvement
in accordance with the provisions of Ordinance No. 22,819
. . . ."

The Ordinance mentioned, No. 22,817, was passed Decem-
ber 27, 1909, and granted to the Northern Pacific Railway
Company the franchise above mentioned, subject to an ac-
ceptance of its conditions within ninety days by the railway
company. It was duly accepted on February 25, 1910, by
resolution of the board of trustees of the railway company,
duly adopted, and thereafter certified to and filed with the
city of Seattle on March 5, 1910.

The special assessment of which complaint is made by
numerous property owners within the district, the appel-
lants herein, was thereafter levied. By the roll, much heavier
assessments were cast upon property in the immediate neigh-
borhood of Fremont and Westlake avenues near the canal
than elsewhere in the district. In making these heavier as-
sessments, the commissioners considered benefits which would
accrue to property in that locality by reason of the contem-
plated erection of a bridge over the canal on the line of these
avenues, which would become a portion of an important thor-
oughfare between the northerly and southerly portions of
the city. The evidence shows the existence of Stone avenue,
another thoroughfare several blocks east of Fremont avenue,
which also runs in a northerly direction from a westerly arm
of Lake Union. On October 6, 1910, the acting secretary
of war issued a permit to the city for the construction of a
temporary bridge across the canal at Stone avenue. At-
tached to this permit is a plat entitled, "Location of pro-
posed trestle bridge across Lake Union from Westlake avenue
to Stone Way." It is manifest that the bridge here contem-

plated at Stone avenue or Stone Way, is to be for temporary use only. Appellants, however, contend a permanent bridge is contemplated; and on the trial insisted the commissioners should have considered the probability of its construction and benefits in casting the assessment. Without discussion, we suggest our conclusion that all evidence relative to any contemplated bridge, either temporary or permanent, at Stone avenue, was immaterial, and that the only question relative to any bridge, to be considered on this hearing, is the probability of a bridge on the line of Westlake and Fremont avenues, a necessary and essential part of the improvement under consideration.

Appellants contend that the assessment is inequitable, unjust, and not cast in accordance with benefits bestowed, as the commissioners considered supposed benefits that may inure by reason of a contemplated bridge at Fremont and Westlake avenues; that there has been no proof that the Federal government by any special act of Congress has authorized, or that it will authorize, the construction of a bridge at that point; that the city is without power in the absence of such authority, and that no bridge may ever be constructed. In support of this contention, they argue that the original Ordinance No. 17,692 fails to mention any proposed bridge; that without any bridge, property in the immediate vicinity of Fremont avenue will be damaged and not benefited; that the city has not officially provided for any bridge at Fremont avenue; that it has provided for one at Stone avenue which appellants contend is the logical place for a permanent bridge, and that the imaginary benefits considered by the commissioners as resulting from a bridge at Fremont avenue do not exist and cannot be the basis of an assessment. The questions to be considered are whether the city has any right to locate and erect the bridge, whether its erection is contemplated and probable, and whether the benefits it will confer were properly considered by the commissioners in casting the assessment.

The Lake Washington ship canal is a navigable waterway lying entirely within the limits of the state of Washington and the city of Seattle. In *Escanaba Co. v. Chicago*, 107 U. S. 678, 687, the supreme court of the United States said:

"Bridges over navigable streams, which are entirely within the limits of a state, are of the latter class [local]. The local authority can better appreciate their necessity, and can better direct the manner in which they shall be used and regulated than a government at a distance. It is, therefore, a matter of good sense and practical wisdom to leave their control and management with the states, Congress having the power at all times to interfere and supersede their authority whenever they act arbitrarily and to the injury of commerce."

For many years Congress has, by its enactments, reserved to the United States government the right to direct changes in, or the removal of, bridges and other structures erected over navigable waters lying wholly within a state, and has conferred upon the secretary of war the power to enforce such control. The policy of the government has been not to determine upon the locality of such bridges, but to reserve to itself the right to approve locations selected and plans proposed by the state authorities, so that navigation and commerce shall not be unnecessarily hindered, impaired, or destroyed. In *Lake Shore & M. R. v. Ohio*, 165 U. S. 365, the court, in discussing the act of Congress of September 19, 1890, chapter 907, said:

"The contention is that the statute in question manifests the purpose of Congress to deprive the several states of all authority to control and regulate any and every structure over all navigable streams, although they be wholly situated within their territory. That full power resides in the states as to the erection of bridges and other works in navigable streams wholly within their jurisdiction, in the absence of the exercise by Congress of authority to the contrary, is conclusively determined. . . . The mere delegation to the secretary of the right to determine whether a structure authorized by law has been so built as to impede commerce,

and to direct, when reasonably necessary, its modification so as to remove such impediment, does not confer upon that officer power to give original authority to build bridges, nor does it presuppose that Congress conceived that it was lodging in the secretary power to that end. . . . The mere delegation of power to direct a change in lawful structures so as to cause them not to interfere with commerce cannot be construed as conferring on the officer named the right to determine when and where a bridge may be built."

Appellants cite § 9 of the subsequent act of March 3, 1899, 30 Stats. at L., 1151, 6 Fed. Stats. Ann. 805, which reads as follows:

"That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the chief of engineers and by the secretary of war: Provided, That such structures may be built under authority of the legislature of a state across rivers and other waterways the navigable portions of which lie wholly within the limits of a single state, provided the location and plans thereof are submitted to and approved by the chief of engineers and by the secretary of war before construction is commenced; . . ."

This section was enacted after the dates of the decisions above cited, and the proviso it contains recognizes the right of the legislature of any state to authorize the construction of bridges across navigable waters which lie wholly within the limits of the state, more clearly and distinctly than it was recognized in the act of September 19, 1890, *supra*. In 1902, in *Cummings v. Chicago,* 188 U. S. 410, the supreme court of the United States, speaking through Mr. Justice Harlan, after quoting from *Lake Shore & M. R. v. Ohio, supra,* the identical excerpt which we have above quoted, in speaking of the later act of March 3, 1899, said:

"Whether Congress may, against or without the expressed will of a state, give affirmative authority to private parties

to erect structures in such waters, it is not necessary to this case to decide. It is only necessary to say that the act of 1899 does not manifest the purpose of Congress to go to that extent under the power to regulate foreign and interstate commerce and thereby to supersede the original authority of the states."

In the recent case of *Hubbard v. Fort,* 188 Fed. 987, the United States circuit court for New Jersey, after commenting on the later act of March 3, 1899, said:

"Among the changes affected by the act of 1899 was to require the affirmative authorization by Congress to create any obstruction to the navigable waters of the United States, except that bridges, dams, dikes, and causeways in or across waters the navigable portions of which lie wholly within the limits of a single state was permitted if authorized by state legislation and the location and plans of such structure were approved by the chief of engineers and of the secretary of war."

As to the policy of the United States government on this question see the following additional cases: *Willson v. Blackbird Creek Marsh Co.,* 2 Pet. 245.; *Withers v. Buckley,* 20 How. 84; *Cardwell v. American Bridge Co.,* 113 U. S. 205; *Montgomery v. Portland,* 190 U. S. 89; 27 Opinions of Attys. Gen. (U. S.) 284.

Appellants cite the act of Congress of March 23, 1906, ch. 1130, 34 Stats. at L., 84, and contend that, by reason thereof, it will be necessary to obtain permission from the national government by special act of Congress before any bridge can be constructed by the city at Fremont and Westlake avenues. The statute cited has no application to the construction of bridges across navigable waters which lie wholly within the limits of a single state. Authority for building the bridge now under consideration is found in the act of March 3, 1899, *supra.* The method of procedure which has been adopted by, and has obtained in, the war department of the United States under these several acts of Congress is disclosed by the various reports of the chief of

engineers of the United States army. For instance, in part 1 of his annual report for 1910, at page 1019, under the subject of "Bridging Navigable waters of the United States," he says:

"Plans and maps of locations of the following bridges proposed to be erected under the authority of special acts of Congress have been examined with a view to protection of the interest of navigation and have been approved by the secretary of war, as provided by the acts, and the local engineer officers have been furnished copies of the instruments of approval and drawings showing the plans and locations and charged with the supervision of the construction of the bridges, so far as necessary to see that they are built in accordance with the approved plans."

Following this statement appears a list of some thirty-four bridges about to be constructed under special acts of Congress. At page 1023 he further says:

"Under the provisions of section 9 of the river and harbor act approved March 3, 1899, bridges may be built over navigable waters entirely within the limits of any state, under authority of legislative enactments of such state, when the plans and locations of the structures are approved by the secretary of war. Plans and maps of locations of the following bridges proposed to be erected under these provisions have been examined with a view to protection of the interests of navigation and have been approved by the secretary of war, and the local engineer officers have been furnished copies of the drawings and instruments of approval and charged with the supervision of construction of the bridges, so far as necessary, to see that they are built in accordance with the approved plans."

Then follows a list of more than one hundred bridges about to be erected under state authority, without any special acts of Congress, some of them being within the limits of this state. The locations and plans of all these bridges were selected and adopted under state authority, and were afterwards approved as reported by the chief of engineers of the United States army acting for and on behalf of the secretary of war. In further illustration of the national policy, ref-

erence may be made to Public Document No. 953 of the
House of Representatives of the 1st session of the 60th
Congress, a letter transmitted to the speaker on May 20,
1908, by the acting secretary of war, which includes a report
of Major H. M. Chittenden relative to the canal. At page
12, Major Chittenden, under the subject "Structures over
the Canal," said:

"The question of bridges over the canal, as well as that
of proper structures for carrying wires, water pipes, sewers,
etc., under the canal has been carefully considered and the
local public has been given to understand what will be re-
quired in these respects. Under date of May 11, 1907, the
secretary of war ordered the removal of existing bridges
over the canal within a specified time. Applications for per-
mission to erect new structures were authorized and when
these applications are presented they will be allowed under
the following conditions:

"Bridges must be draw or lift bridges of permanent char-
acter—steel or masonry. The clear width of opening must
be at least 150 feet, measured perpendicular to the line of
the channel. Foundations must be carried well below the
limit of probable dredging. The clearance under all bridges,
except those at the head of Salmon Bay, must be 30 feet
above high water. At the head of Salmon Bay 20 feet will
be admitted, on account of the difficulty of providing ap-
proaches with a greater height. Bridges must be equipped
with efficient machinery for operating them quickly. Tele-
graph or other wires carried overhead must clear the chan-
nel by 200 feet. Sewers, water pipes, conduits for wires,
etc., carried under the channel must be at least 36 feet be-
low mean low water."

Compliance with these conditions will enable the city to
reconstruct the bridge. From authorities cited, and the his-
tory of Congressional legislation, it is manifest that the na-
tional policy as to navigable waters lying wholly within a
state has at all times been that the state, or its authorized
representatives, shall, in the first instance, select locations
and adopt plans for bridges, but that prior to actual con-
struction, and for the protection of navigation, such loca-

tions and plans shall be approved by the secretary of war. In pursuance of the act of March 3, 1899, and in harmony therewith, the legislature of this state enacted chapter 157, Laws of 1909 (Rem. & Bal. Code, §§ 7868 and 7869). A prior statute relative to bridges, Laws 1890, p. 54 (Rem. & Bal. Code, §§ 7862-7867), also provided for the protection of navigation. The records in this cause show that the original bridge over the canal at Fremont avenue was constructed at a point selected by, and in accordance with, plans adopted by the city of Seattle and afterwards approved by the secretary of war, with the understanding, as shown by the permit of the secretary of war, "that said bridge shall be removed or rebuilt when the work of constructing the canal may render such action necessary." This condition did not contemplate that the secretary of war might thereafter arbitrarily order the bridge removed and prohibit the erection of another in its place, but did contemplate that the city, at its election, might rebuild at the same point, provided it adopted plans for rebuilding, which the secretary of war would approve. H. M. Chittenden, major of the corps of engineers of the United States army, in recognition of this right, not only advised the city board of public works of the necessity of removing the old bridge in aid of the canal development, but also advised them of particular specifications which the chief of engineers of the United States army, acting for the secretary of war, would require in plans for a new bridge to be thereafter constructed at the same point, his manifest intention being to aid the city in its adoption of plans for a new bridge, and thereby facilitate its labors.

It is not to be presumed that the chief of engineers or the secretary of war will arbitrarily refuse to approve any plans whatever. The only duty imposed upon them is to see that no unnecessary interference with navigation is caused by the new bridge when erected. Property rights and business interests of the city of Seattle are to be protected and con-

served as well as the interests of navigation. Large portions of the city lie on either side of the canal. It is absolutely necessary that means be provided for the public to cross and recross. There must be at least one bridge, and possibly several, across the canal. The record satisfies us that a bridge will be erected at Fremont avenue, that it will comply in every respect with Federal and state requirements, and that it will be approved by the chief of engineers and secretary of war. The grades of Fremont and Westlake avenues are to be raised to an extent sufficient to afford proper approaches for such a bridge. The grades thus adopted and constructed would be useless for any other purpose. There can be no question but that a bridge must be constructed as an essential part of the improvement, that it will materially benefit adjacent and abutting property, and that such resulting benefits were properly considered by the commissioners in casting the assessment.

In *Dickson v. Racine*, 65 Wis. 306, 27 N. W. 58, the court, speaking of benefits to be conferred by a bridge constructed across a stream on the line of a street improvement, said:

"We are, however, of the opinion that in assessing benefits the commissioners and jury would be justified in taking into consideration the benefits which would accrue to the lots from the expectation that a bridge would be constructed across the river, at the end of the street, within a reasonable time. The reason for opening the street was to make an approach to a bridge, the construction of which was contemplated by the city in the near future. It would seem absurd to say that such fact should have no effect in estimating benefits. The opening of this street in question rendered it practicable for the city to construct a bridge at the end of it, across the river, and without this street no such bridge could have been constructed which would have been of any public use. The opening of the street rendered it practicable to build a bridge at that place across the river, which would be a great public convenience; and, it appearing also that it was almost a public necessity to have a bridge at

that place, it would seem reasonable that such fact would tend to enhance the value of the property in the vicinity of such new street, and it was for the jury to determine whether that fact did or would enhance the value of the plaintiff's lots. This view of the case was entertained by the supreme court of Ohio in the case of *Chamberlain v. Cleveland*, 34 Ohio St. 551-568."

In preparing the roll the commissioners did not assess the right of way of the Northern Pacific Railway Company, which appellants now argue was benefited and should have been assessed. They insist the trial court erred in not requiring the commissioners to prepare a new roll and assess it. The right of way is entirely within the limits of Westlake avenue. If it should be abandoned by the railway company, the property on which it is located would continue a public street, and would not be subject to assessment. Appellants, in support of their contention, cite *Northern Pac. R. Co. v. Seattle*, 46 Wash. 674, 91 Pac. 244, 123 Am. St. 955, 12 L. R. A. (N. S.) 121. There the assessment was upon private property abutting the street, and the assessment was sustained because the real estate was benefited and could not be relieved from liability to assessment by reason of its having been devoted to a use not benefited by the improvement. The theory upon which that case was decided is disclosed by the following language used in the opinion:

"Although the appellant may not hold the fee simple title, there is no reasonable or immediate probability that it will abandon the land. Its use will doubtless be perpetual. Appellant is, therefore, for all practical purposes, the substantial owner. The fee subject to its use and easement is of but little value, if any. Except for appellant's occupancy, no suggestion would be made that the land was not benefited by the improvement, or that it would not be subject to the assessment. The particular use of the land cannot affect its liability to assessment. Abutting property cannot be relieved from the burden of a street assessment simply because its owner has seen fit to devote it to a use which may not be

specially benefited by the local improvement. The benefit is presumed to inure, *not to such present use, but to the property itself,* affecting its value. . . . It is also elementary that the whole theory of special assessment is based on the doctrine that the property against which it is levied derives some special benefit from the local improvement."

Were the use which the Northern Pacific Railway Company will make of Westlake avenue to be discontinued, we could not hold the street divested of such use to be benefited and assessable. The principles announced in the later case of *Seattle v. Seattle Elec. Co.,* 48 Wash. 599, 94 Pac. 194, 15 L. R. A. (N. S.) 486, are applicable here. Speaking of the franchise of the Seattle Electric Company, we then said:

"The respondent's right in the street is in no sense a lot, block, tract or parcel of land. It does not own the fee of the street over which its tracks are laid and its cars operated, nor does it have dominion or control over that portion of the street. On the contrary, the fee of the street rests in the abutting property holders, to whom it will revert when the interests of the public therein cease from any cause, and dominion and control over it is vested in the public authorities in whom it will remain as long as the street retains its public character. The respondent's rights therein are such and only such as these public authorities have conferred, and are, roughly speaking, the right to construct and maintain for a limited time a railway track on a fixed portion of the street, and the right to operate cars on such track for the purpose of carrying passengers and freight for hire. This does not constitute either a lot, block, tract or parcel of land, nor does it constitute an interest in land as that term is ordinarily understood, it is an easement only, and as such is not assessable under a power to assess lots, blocks, tracts and parcels of land."

From statements above made, it appears that the city in granting the franchise imposed conditions upon the railway company which would compel it to make a substantial cash contribution towards defraying the expense of this improvement. Manifestly it did so in contemplation of the fact that the right of way and franchise in the street could not be

assessed. We find no merit in appellants' objection. The judgment is affirmed.

CHADWICK, MOUNT, ELLIS, and MORRIS, JJ., concur.