[No. 25035. Department Two. February 4, 1935.]

IN RE AURORA AVENUE, SEATTLE.[1]

*Allen, Froude & Hilen, Preston, Thorgrimson &*
*Turner, Meier & Meagher, Kerr, McCord & Carey,*

[1] Reported in 41 P. (2d) 143.

*Stedman & Stedman, Caldwell & Lycette,* and *Arthur G. Dunn, Jr.,* for appellants.

*A. C. Van Soelen* and *John E. Sanders (J. Ambler Newton* and *Charles L. Smith,* of counsel), for respondent.

BLAKE, J.—July 10, 1930, the city council of Seattle passed ordinance No. 57919, providing for the opening, widening and establishing of Aurora avenue between Broad street and Hillside place, and between north Thirty-sixth street and its juncture with west Green Lake way at north Sixty-fifth street. The ordinance also provided for the widening and extending of west Green Lake way to its juncture with Woodland Park avenue at Seventy-second street. Further provisions were made for the opening and establishing of certain lateral streets running into Aurora from the east and west. With an exception (unnecessary to note here), the ordinance with respect to payment for the improvement provided:

"That the entire cost of the improvement provided for herein shall be paid by special assessment upon the property specially benefited, in the manner provided by law, or from such fund as the City Council of The City of Seattle may direct, or by both special assessment and from such fund . . . ."

A suit was brought to condemn the property necessary to carry out the improvement. The total cost of the condemnation (including awards to property owners and costs of suit) was $1,861,045.73. After judgment, the proceedings were referred to the board of eminent domain commissioners, who, in accordance with the provisions of Rem. Rev. Stat., § 9238 [P. C. § 7568], returned an assessment roll to the court. By their return and assessment roll, the commissioners assessed special benefits to the city at large in the approximate sum of $540,000. The balance, $1,311,000,

was assessed to property deemed by the commissioners to be specially benefited by the improvement.

Numerous owners filed objections to the assessments made against their property. After a lengthy hearing, the court entered judgment making a blanket reduction of fifty per cent on all property in the assessment district. The court did not disturb the boundaries of the district, nor the ratio of assessments as determined by the commissioners. The property owners have appealed from the judgment. The city has not appealed.

At the outset, it is to be noted that, as the case comes to us, approximately only one-third of the cost of the improvement is assessed to property specially benefited, leaving approximately a million and a quarter dollars to be paid by the public at large. The objectors, however, are not satisfied. They say that the whole cost of the improvement should be borne by the public at large. Before going into the reasons the objectors advance in support of their position, it will be well for us to review the scope of the functions, not only of the board of eminent domain commissioners, but of this court as well, in proceedings such as this.

At an early time, this court declared:

". . . that the action of the commissioners, in apportioning the amounts to be borne respectively by the city as a whole and by the property specially benefited, is conclusive, in the absence of fraud, mistake (of fact or law, but not in matters of opinion), or arbitrary action amounting to a manifest abuse of discretion. The same may be said as to the size of the district, and the quantity of property covered by the assessment roll which it returns." *In re Westlake Avenue,* 40 Wash. 144, 82 Pac. 279.

This rule has been repeatedly applied, in its various phases, to the boundaries of the district, as to whether they should be extended to include more property (*In*

re *Harvard Avenue North,* 47 Wash. 535, 92 Pac. 410), or less (*In re Western Avenue,* 93 Wash. 472, 161 Pac. 381); to the apportionment of the costs between the general public and property specially benefited (*In re Ninth Avenue,* 79 Wash. 674, 141 Pac. 61); and to the ratio of assessments on property specially benefited (*In re Boyer Avenue,* 79 Wash. 664, 141 Pac. 58).

Likewise, the judgment of the commissioners as to what constitutes a special benefit has been accorded wide scope and great weight. It has been held that improved access to a bridge was such a special benefit as to form the basis for assessment (*In re Westlake Avenue,* 66 Wash. 277, 119 Pac. 798). Likewise, it has been held that the opening of a street affording a large area a more direct access to a public park was a special benefit (*Spokane v. Fonnell,* 75 Wash. 417, 135 Pac. 211). Even an improved view has been held to be a circumstance which the eminent domain commissioners might properly consider in determining the amount of assessment on a piece of property (*In re Seattle,* 46 Wash. 63, 89 Pac. 156).

The reasons underlying the foregoing rules are succinctly stated in *In re Pine Street,* 57 Wash. 178, 106 Pac. 755, and in *Spokane v. Fonnell, supra.* In the former case, it is said:

"It is always difficult to determine the exact dividing line where the special benefits cease and general benefits begin in this class of cases."

In the latter case:

"The commissioners being appointed for the very purpose of doing these things, their action is entitled to the same presumption which attends official action in other cases, and is conclusive in the absence of mistake, fraud or arbitrary discrimination amounting to an abuse of discretion."

█ If we had ever entertained a doubt as to the

wisdom of these rules, so long established, our examination of the record in this case would have dispelled it. The improvement for which the condemnation was necessary was an integral part of the proposed construction of the George Washington Memorial bridge across Lake Washington canal. In making up their assessment roll, the commissioners proceeded upon that theory.

As we understand the record, there were certain fundamental physical facts upon which the commissioners built their assessment structure. These were that one-third of the population of Seattle resided north of the canal; that the main business district of the city lay south of the canal; that the only means of access from the residence district to the business district was by means of four draw bridges across the canal; that two of these bridges (the Fremont and University) were taxed to more than their capacity; that traffic congestion on these bridges was frequent and heavy; that, when the bridges were raised, traffic would be backed up three-quarters of a mile from the bridge; that, in such instances, it would be a half to three-quarters of an hour before traffic would resume its normal flow. This congestion was largely contributed to by the presence of street car tracks on both bridges. The George Washington Memorial bridge was to be a stationary structure, high above the canal and without street car tracks. Approximately sixty-five per cent of the people living north of the canal crossed the bridges in automobiles.

There are two component parts of the assessment district—one lying north of the canal, and the other south. The theory of the assessment on property included in the assessment district north of the canal was that, being tributary to Aurora avenue and the bridge, it was specially benefited by reason of the im-

proved access to the business district south of the canal. This theory finds ample authority in *In re Westlake Avenue*, 66 Wash. 277, 119 Pac. 798, and *Spokane v. Fonnell*, 75 Wash. 417, 135 Pac. 211. Accordingly, the commissioners fixed the northerly boundary of the district at the city limits. The east boundary south to north Sixty-eighth street was approximately along Sixth avenue northeast. At north Sixty-eighth street, the boundary dropped west to Latona avenue. Approximately following Latona avenue to east Forty-third street, it again dropped to the west to First avenue northeast. It proceeded south approximately along First avenue northeast to north Thirty-ninth street. Thence, the boundary line took a zig-zag course westerly to Aurora avenue, which it intersected near north Thirty-sixth street. The westerly boundary of the district approximately followed the Phinny ridge from the city limits to north Thirty-ninth. There, the southerly boundary took an indirect course to Aurora avenue, which it intersected at the same point as the southerly boundary on the east side of Aurora.

Factors entering into the fixing of these boundary lines were topographical conditions and relative distance from the business center by the various routes, namely, the Fremont bridge, the University bridge, and the proposed Memorial bridge. But underlying it all was the relief from congestion on the first two routes and the easier access afforded by the last.

And the event justified the judgment of the commissioners. In 1931, a traffic count on the Fremont bridge showed 34,293 vehicles crossing in a day; on the University bridge 32,555. The hearing on the assessment roll was not concluded until after the Memorial bridge was opened. A traffic count taken in 1933 showed 13,153 vehicles crossing at Fremont, 21,880 at Univer-

sity, and 21,272 at Aurora. These figures are not a basis for an exact comparison, because the total traffic count on all bridges crossing the canal was fifteen per cent less in 1933 than in 1931. But at that, the figures support, in a remarkable degree, the judgment of the commissioners as to the effect of the opening of Aurora avenue on traffic flow from the area included in the assessment district north of the canal into the business portion of the city.

Appellants contend, however, that property in the assessment district received no special benefit from the improvement; that, at most, it received a general benefit which was no different from the benefits accruing to all other property in Seattle. Indeed, they go so far as to say that the improvement was an integral part of the Pacific highway—a sort of bypass to north traffic on that highway through Seattle; that, therefore, the state should pay the whole cost, and if not the state, the city. That the improvement is a part of an arterial highway from which the public receives some general benefit, does not preclude the idea of special benefit to property particularly served by the improvement. Nor does such fact prevent the levy of assessments for such special benefits. *In re Boyer Avenue*, 79 Wash. 664, 141 Pac. 58.

South of the canal (with the exception of a small non-abutting area at the north end), the district includes only property abutting on Aurora avenue until midway of the block between Galer and Lee streets. There, the west boundary is extended to the middle of the block between Taylor avenue and Sixth avenue north. The district includes the half block abutting on Taylor street down to Denny way and Vine street. There, the westerly line follows Vine street to a point midway of the block between First avenue and Western avenue. From there south to a point midway of

the block between University and Seneca streets, the district includes all property abutting on First avenue. The boundary then extends east through the middle of the blocks bounded by Seneca and University streets, until it reaches a point in the middle of the block between Second and Third avenues.

As we have seen, the easterly boundary includes only the property abutting on Aurora, until it reaches Denny way. From there, it extends southeasterly to Westlake avenue, including all property abutting on Seventh avenue between those two streets. It then follows the westerly line of Westlake avenue to Fourth and Pike. From that point, it pursues a zig-zag course until it connects with the southerly boundary.

It will be observed that the southerly end of the assessment district includes the heart of the retail business district of the city. The theory underlying the assessment on this property is that the Aurora avenue improvement would render pedestrian traffic more directly tributary thereto than it had been before. And in this instance, also, we think the event has justified the judgment of the commissioners. Prior to the improvement of Aurora avenue, there were three routes into the business district from the property located in the assessment district north of the canal: Eastlake, with its tributaries, coming from the University bridge; Westlake and Dexter, coming from the Fremont bridge. Ultimately, traffic from those sources might filter through to that portion of the business district with which we are here concerned. It may be assumed that such is the fact. But it does not follow that the property in question has not received special benefits from the opening up of Aurora avenue. It is suggested that this same property has borne assessments successively for the opening up of Westlake, Eastlake and Dexter. This, however, does not pre-

clude assessment for another improvement from which it has received special benefits. *In re Third, Fourth and Fifth Avenues,* 55 Wash. 519, 104 Pac. 799.

We have already seen how traffic over the Fremont and University bridges has fallen off since the opening of Aurora avenue. It is obvious that the traffic which has been diverted from the University bridge to Aurora enters the business area included in the assessment district much more directly than it did over Eastlake. Likewise, we think it has been demonstrated that the traffic which has been diverted from Westlake and Dexter enters the business area included in the assessment district more directly than before.

In 1931, a traffic count on Westlake just south of Valley showed a passing of 17,888 vehicles. At the same point in 1933, the count was 9,269. (It is interesting to note that, in the early stages of the hearing on the assessment roll, before Aurora was opened for travel, the city traffic expert testified that he estimated there would be 8,902 vehicles passing that point after Aurora was opened.)

The traffic figures on Dexter are equally significant. Prior to the opening of Aurora, two-thirds of the traffic coming in on Dexter was diverted at Broad street. It was predicted that the major portion of the traffic diverted from Dexter would continue down Aurora to Wall—four blocks south of Broad—before it was diffused. The event justified the judgment of the commissioners. In 1931, the count on Broad street west of Aurora was 13,906; in 1933, after the opening of Aurora, 7,964. On Dexter, north of Denny way, in 1931, the count was 4,703; in 1933, it was 4,080. On Aurora, in 1933, the count north of Denny Way was 13,219. On Dexter, north of Broad, in 1931, the count was 12,883. We think these figures demonstrate that the major portion of the traffic diverted from Westlake and Dexter was carried (as anticipated) down to Wall and

into the business area included in the assessment district on a more direct route by the opening of Aurora avenue. This, in our opinion, was a special benefit to the property included in the assessment district.

Appellants stress *In re Taylor Avenue Assessment,* 149 Wash. 214, 270 Pac. 827, as holding that the business area here involved received no special benefit from the opening of Aurora avenue. We are unable to get any such meaning from that decision. There, this same area was assessed for the second Denny hill regrade improvement. That improvement was designed to bring some three hundred sixty lots to a grade whereby they became potentially competitive as business property with the business area lying to the south. The court did say that the proposed new bridge at Stoneway was not such a special benefit as to warrant the extension of the assessment district to the south over the business area here involved. But the gist of the holding is that property in the latter area could sustain no special benefit from an improvement which brought into existence a potentially competitive business district. Furthermore, the proposed new bridge was not an integral part of that improvement, as it is of this. This distinction, we think, is made clear in the case of *In re West Marginal Way,* 112 Wash. 418, 192 Pac. 961, which was cited by the writer of the opinion in the *Taylor Avenue Assessment* case, *supra.*

We are satisfied that the assessments made in this proceeding were neither arbitrary nor capricious. On the contrary, we think the commissioners exercised sound judgment and acted on a fundamentally correct basis in creating the district and in assessing benefits.

Judgment affirmed.

BEALS, HOLCOMB, MITCHELL, and STEINERT, JJ., concur.