IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CENTRAL TERMINALS, LLC, a Washington limited liability company, | ) ) ) | No. 38787-9-III |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| GRANT COUNTY PORT DISTRICT NO. 10, a municipal corporation, | ) ) ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Grant County Port District No. 10, also known as the Port of

Moses Lake (the Port), appeals a superior court decision granting Central Terminals

LLC's appeal of the final assessment roll for a local improvement district encompassing

land within and near the Port-owned Grant County International Airport. The superior

court held that Central Terminals' assessment was based on a potential zoning change for

its property and its property's potential inclusion in the urban growth area (UGA) for

Moses Lake and was thereby "improperly speculative and done upon a fundamentally

wrong basis." Clerk's Papers (CP) at 822.

The assessment arrived at for Central Terminals' property took into consideration

what was reported to be the "strong probability" of a rezone approval that Central

Terminals had already requested from the city of Moses Lake in 2019, when it also

petitioned the city for inclusion of its property in the UGA. The Port's expert considered

only that potential, and the "[c]osts and risks associated with obtaining re-zone approval."

CP at 399-400. Central Terminals offered no expert testimony that the potential rezone

and UGA inclusion were *not* properly taken into consideration, or that the costs and risk

associated with obtaining approval had been underestimated.

Central Terminals failed to overcome the presumption that the Port's assessment

was correct and fair. We reverse the superior court's order and confirm the final

assessment roll as it relates to Central Terminals' properties.

FACTS AND PROCEDURAL BACKGROUND

At issue is a benefit assessment arrived at for undeveloped land that Central

Terminals owns west of the Grant County International Airport. In February 2019, the

Port created a local improvement district known as the Westside Employment Center

Local Improvement District (the LID). The total land area within the LID boundary is an

estimated 2,324.2 acres, 1,632.59 acres of which is owned by the Port.[1] Of the privately-

owned land located within the LID's boundary,160 acres, made up of two adjacent

parcels, is owned by Central Terminals.

The LID was created for the purpose of paying the costs of road, water, sewer, and

electric power improvements. As described by the preliminary benefit and proportionate

_____

[1] In assessing benefits, the Port's valuation expert treated an estimated 142 acres
of the Port's land as unusable, with Port ownership set at an estimated 1,491 acres of
usable land.

2

assessment study prepared for the Port by ABS Valuation in May 2020, the

improvements consisted of a 3.2± mile connector road from State Highway 17 to Route

10, and utility extensions that would be made possible by construction of the connector

road. State Highway 17 is a limited access highway and, according to the ABS study, the

Port holds a "legacy easement" that would allow it to construct an approach not possible

without Port participation. CP at 337. The connector road would be a two-lane, 30-foot-

wide road with bituminous surface treatment and gravel shoulders within an 80-foot

easement donated by the Port to Grant County. For ownerships lacking direct frontage

on the new road, sections of gravel easement road 26 to 28 feet wide would be

constructed.

Construction of the road would make it possible to make water service, domestic

and industrial sewer mains available to all properties within the LID boundary, although

utility extensions to the property lines of some ownerships would still be needed.

ABS's benefit/assessment study analyzed the "special benefit" to each ownership

within the LID boundary. It defined "special benefit" as "[t]he difference in the fair

market value of the property without the improvement and the fair market value of the

property with the improvement." CP at 344. The total cost for the LID improvements

was estimated at the time of ABS's 2020 study to be $6,500,000. ABS estimated total

benefits to the properties at that time to be $8,353,000, for a cost/benefit ratio of 77.82,

"[i]n other words, each parcel receives one dollar in special benefit for each

$ 0.78± of LID assessment." CP at 339.

The benefit/assessment study devoted three single-spaced pages to explaining its

determination of the special benefit to Central Terminals' parcels depicted on the LID

map as parcels 17 and 18. It pointed out that Central Terminals' property lacked frontage

on any established road, and an extension of utilities would not be possible without

construction of the connector road to be built by the project. It pointed out that the

property was then zoned Rural Residential 1 (RR1), and that in 2019 Central Terminals'

owners had petitioned the city of Moses Lake for inclusion within its UGA and had

requested a rezone to the Urban Heavy Industrial (UHI) zoning classification. It reported

that according to Port officials, there was "a strong probability of re-zone approval," but

Central Terminals' owners had not yet applied to Grant County for inclusion in the UGA,

and county and city officials indicated that any rezone request would be at least two years

from approval. CP at 399.

The ABS study summarized the "highest and best use" of the property without

(before) and with (after) the LID as follows:

> Highest and best use without the project is for investment hold until such
> time as necessary infrastructure (both physical, legal road access and all
> attendant necessary utilities) is constructed. Utilities that are present on
> other parts of the airport property would not be extended and therefore
> could not be utilized without the connector road; this is the "before LID"
> condition.

4

With the LID in place, Port of Moses Lake/Grant County Municipal Airport facilities and utilities are available, and the subject parcel has frontage on a new two-lane county road . . . .  Utilities are available along the new road . . . to map number 17, with 310 LF [lineal feet] of domestic water extension needed.  Further road and utility extensions would be needed in order for map number 18 to be developed.

Highest and best use with the project completed is for investment hold for future potential re-zone approval. . . .  Costs and risk associated with obtaining re-zone approval are considered within the valuation analysis.

CP at 663.  The ABS study assumed that the property would be purchased/sold as a single entity and arrived at the following special benefit assessment for the property:

**Map Numbers 17 & 18 - Valuation Summary Without and With LID**

| Map No. | Land Area (Acres) | Land Area (SF) | Zoning | Without LID Value | With LID Value | Special Benefit | Special Benefit/SF |
|---|---|---|---|---|---|---|---|
| 17 | 100.00 | 4,356,000 | RR1 | $131,000 | $479,000 | $348,000 | $0.08 |
| 18 | 60.00 | 2,613,600 | RR1 | $52,000 | $209,000 | $157,000 | $0.06 |
| Overall Market Value Estimates | | | | $183,000 | $688,000 | $505,000 | |

CP at 664.

Central Terminals contacted the Port to challenge aspects of ABS's preliminary analysis of the special benefit to its property.  It pointed out that contrary to ABS's "without LID" valuation, it *did* have legal access through adjacent properties.  It argued that ABS underestimated the time and risk involved in becoming included in the UGA, providing a letter from Gil Alvarado of GAJ Urban Planning Services, who was working with Central Terminals on its land use issues.

ABS reviewed the challenges and prepared an addendum to its benefit/assessment study, reducing its assessment of the special benefit to Central Terminals' ownership as follows:

| LID Map No. | Original Without LID Value | Original With LID Value | Original Special Benefit Estimate | Revised Without LID Value | Revised With LID Value | Revised Special Benefit Assessment | Special Benefit Difference |
|---|---|---|---|---|---|---|---|
| 17 | $131,000 | $479,000 | $348,000 | $150,000 | $440,000 | $290,000 | ($58,000) |
| 18 | $52,000 | $209,000 | $157,000 | $72,000 | $195,000 | $123,000 | ($34,000) |

CP at 765 (modified). It nonetheless explained that, "Consistent with our original analysis the after value also reflects the fact that obtaining UGA status without the LID is very unlikely and the market would reflect this in any purchase decision." CP at 764.

In March 2021, the Port Commission adopted a resolution establishing the LID and, in July 2021, it set a hearing on the final assessment roll for the LID, to take place on August 9, 2021. A Central Terminals member, Robert Fancher, and lawyer, Trevor Bevier, attended the hearing, at which they objected to the assessment on Central Terminals' behalf. They contended that the assessment was based on "speculation and distribution costs of the final project cost, rather than the basis of special benefits to the property." CP at 562. They did not offer competing appraisal or expert evidence to support their objections.

Several speakers complained during the public hearing that they had received notice of the proposed assessment for their ownership but nothing more. Following the hearing, Port staff e-mailed to affected property owners a spreadsheet reflecting the cost

6

of the project and a breakdown of the special assessment against each of the affected parcels. The spreadsheet also reflected the effect of a grant that had been obtained by the Port and would ratably reduce each owner's assessment. The effect of the grant on Central Terminals was a reduction of its total assessment to $291,985.56.

At their August 23 meeting, the commissioners approved and confirmed the final assessment roll for the project.

Central Terminals timely appealed the final assessment roll to superior court. The parties submitted briefing and evidence, and the superior court heard oral argument. Among materials submitted in support of a declaration from Kim DeTrolio, the Port's director of finance and administration, was its exhibit 11: an August 18, 2021 response by ABS to Central Terminals' written objection to its assessment. Ms. DeTrolio testified in her declaration that the ABS response "was provided to the Port Commission as part of its agenda packet before the [August 23] meeting." CP at 587. Central Terminals objected to the superior court's consideration of the exhibit and, according to court minutes, the superior court reserved ruling on the objection.

The court took the appeal under advisement and later issued an order finding that the "LID Assessment of the Central Terminals Property was improperly speculative and done upon a fundamentally wrong basis by using a future re-zone from RR1 to UHI and future inclusion within the UGA." CP at 822. The court ordered "the Port of Moses Lake is to correct the Assessment for the Central Terminals Property in accordance with

7

the Court's findings." *Id.* The order did not disclose a ruling on Central Terminals'

objection to ABS's August 18, 2021 response to its objection. The Port timely appealed.

ANALYSIS

The Port asks us to reverse the superior court's ruling granting Central Terminals'

appeal for three reasons: (1) the court found that the assessment was founded on a

"fundamentally wrong basis," yet relied on an issue that would not necessitate a

nullification of the entire LID; (2) Central Terminals failed to demonstrate that for ABS

to analyze "highest and best use" following the LID as "investment hold for future

potential re-zone approval" was improperly speculative; and (3) Central Terminals failed

to present expert testimony rebutting the presumption that the benefit assessment was

correct and fair.[2]

I. STANDARDS FOR CONFIRMATION AND REVIEW

Port districts are authorized to establish local improvement districts and levy

assessments on property specially benefited by the improvement. RCW 53.08.050(1).

A "special benefit" is "the increase in fair market value attributable to the local

improvements." *Doolittle v. City of Everett*, 114 Wn.2d 88, 103, 786 P.2d 253 (1990).

---

[2] The parties dispute whether ABS's August 18, 2021 response to the objections raised by Central Terminals at the public hearing was part of "the record of the proceedings before the [legislative body]" that *Abbenhaus v. City of Yakima* holds is judicially reviewed. 89 Wn.2d 855, 859, 576 P.2d 888 (1978). Since it makes no difference to the issues on which we reverse the superior court, we decline to address the issue.

The amount of special benefit accruing from a local improvement is the difference between the fair market value of the property immediately after and before the benefit has accrued. *Id.* at 93. Any formula for measuring special benefit "must ultimately relate to benefits, not merely the distribution of costs." *Bellevue Plaza, Inc. v. City of Bellevue*, 121 Wn.2d 397, 415, 851 P.2d 662 (1993). Present use should be considered, as well as future use to which the property is reasonably well adapted. *Doolittle*, 114 Wn.2d at 93 (citing *In re Consolidated Appeals of Jones*, 52 Wn.2d 143, 146, 324 P.2d 259 (1958)). Property cannot be relieved from the burden of a local improvement district assessment simply because the owner has seen fit to devote it to a use that may not be specially benefited by the local improvement. *Id.* (citing *Jones*, 52 Wn.2d at 146). Nevertheless, "[t]o be subject to an LID assessment, a property must realize a benefit that is 'actual, physical and material[,] not merely speculative or conjectural.'" *Hasit LLC v. City of Edgewood (Loc. Improvement Dist. No. 1)*, 179 Wn. App. 917, 933, 320 P.3d 163 (2014) (alterations in original).

The decision of a port commission to confirm an assessment roll is final and conclusive except as to timely written objections. RCW 35.44.190. The decision on such an objection is subject to review by the superior court upon appeal. RCW 35.44.200. The superior court shall confirm unless it finds from the evidence that the "assessment is founded upon a fundamentally wrong basis and/or the decision of the [commission] was

9

arbitrary or capricious," in which case it may "correct, change, modify, or annul the assessment insofar as it affects the property of the appellant." RCW 35.44.250.

"Fundamentally wrong basis"—the ground on which the superior court ordered correction of the assessment here—"'refers to some error in the method of assessment or in the procedures used by the [commission], the nature of which is so fundamental as to necessitate a nullification of the entire LID, as opposed to a modification of the assessment as to a particular property.'" *Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 859, 576 P.2d 888 (1978) (quoting *Cammack v. City of Port Angeles*, 15 Wn. App. 188, 196, 548 P.2d 571 (1976)). Despite the breadth of invalidation that must be shown, the statutory remedy is limited to nullifying or modifying only those assessments that were appealed. *Id.*

The judgment of the superior court may be appealed to the Court of Appeals. RCW 35.44.260. The Supreme Court held in *Abbenhaus* that our review is limited to the record of proceedings before the legislative body approving the assessments and, consistent with legislative intent to limit court involvement in assessment proceedings, is not an independent consideration of the merits of the issue. 89 Wn.2d at 859-60. It is, instead, a consideration and evaluation of that body's decision-making process. *Id.*

"We begin with a presumption of the correctness of the [commission's] action; the burden is upon one challenging the assessment to prove its incorrectness," further, it is presumed "'that the assessment is fair.'" *Id.* at 860-61 (quoting Philip A. Trautman,

10

*Assessments in Washington*, 40 WASH. L. REV. 100, 118 (1965)). The presumptions

establish which party has the burden of going forward with evidence on an issue, but the

burden of proof shifts back to the commission once the objecting party presents expert

appraisal evidence showing that the property would *not* be benefited by the improvement.

*Bellevue Plaza*, 121 Wn.2d at 403. Claims of unfairness that lack supporting evidence of

appraisal values and benefits are inadequate to overcome the presumptions. *Abbenhaus*,

89 Wn.2d at 861.

II.      ANALYZING THE HIGHEST AND BEST USE OF CENTRAL TERMINALS' PROPERTIES
         WITH THE LID AS "INVESTMENT HOLD FOR FUTURE POTENTIAL RE-ZONE
         APPROVAL" WOULD NOT NECESSITATE NULLIFYING THE ENTIRE LID, EVEN IF
         ERROR

As explained by our Supreme Court in *Abbenhaus*, the controlling statute on the

courts' authority to correct, change, modify, or annul a legislative body's benefit

assessment was amended and narrowed by the legislature shortly following the court's

decision in *In re Schmitz*, 44 Wn.2d 429, 268 P.2d 436 (1954). 89 Wn.2d at 858. In

*Schmitz*, the court had "reviewed the trial court's evidence in detail" and overturned a

municipality's approval of an assessment "based upon [the court's] view of the merits."

*Id.* The court acknowledged in *Abbenhaus* that the legislature's intent in responding with

the statutory amendment was to "limit[ ] court involvement in assessment proceedings."

*Id.* at 859.

Consistent with that intent, the court held that a "'fundamentally wrong basis'" is not present if an error in the method of assessment or procedures used necessitates only "'a modification of the assessment as to particular property.'" *Id.* (quoting *Cammack*, 15 Wn. App. at 196). Instead, the nature of the error must be "'so fundamental as to necessitate a nullification of the entire LID.'" *Id.* (quoting *Cammack*, 15 Wn. App. at 196). *Abbenhaus* adopted this standard from the Court of Appeals' decision in *Cammack*, which pointed to the reassessment procedures set forth in RCW 35.44.280 as containing "[e]xamples of this type of error." 15 Wn. App. at 196. RCW 35.44.280 authorizes reassessment where assessments are not valid "for want of form, or insufficiency, informality, irregularity, or nonconformance with the provisions of law, charter, or ordinance." *Cammack* also suggested that "fundamental" errors "should be ascertained as a matter of law by reference to the transcript which plaintiff is required to certify" and which "should demonstrate, without reference to extrinsic evidence, whether the statutes and ordinances or charters have been followed." *Id.* at 196-97 (citing RCW 35.44.230).

In *Cammack*, this court readily found that the record of approval and confirmation of the city council's assessment "shows no errors of this nature." *Id.* at 197. Central Terminals is unable to point to any error of that nature in the record of the commissioners' approval and confirmation of the assessments here.

III.    CENTRAL TERMINALS DOES NOT DEMONSTRATE THAT ABS'S CONSIDERATION OF ITS PROPERTIES' INCREASED INVESTMENT VALUE WAS SPECULATIVE OR CONJECTURAL

A.    ABS analyzed the improvements' immediate impact on value

"The amount of the special benefit accruing to property as a result of a local improvement is the difference between the fair market value of the property immediately after the special benefits have accrued and the fair market value of the property before the special benefits have accrued." *Doolittle*, 114 Wn.2d at 93. "'[F]uture use to which property is reasonably adaptable within a reasonably foreseeable time is considered in determining the amount of special assessments.'" *Bellevue Plaza*, 121 Wn.2d at 413 (quoting *Doolittle*, 114 Wn.2d at 104).

"[W]hen an appraiser uses a factor 'beyond the knowledge of reasonable certainty', it becomes pure speculation." *Id.* at 411 (quoting *In re Local Improvement No. 6097*, 52 Wn.2d 330, 335-36, 324 P.2d 1078 (1958)). But the ABS analysis of the increase in the value of Central Terminals' property did not compare its highest and best "without LID" to a highest and best use "with LID" as property in the UGA, zoned UHI. Its "with LID" analysis was, instead, as "investment hold" property "for future *potential* re-zone approval," taking into consideration "[c]osts and risk associated with obtaining re-zone approval." CP at 400 (emphasis added). Obtaining the desired rezone and UGA inclusion may be beyond the knowledge of reasonable certainty, but that is not the issue. At issue is whether significantly increasing the prospects for a rezone and UGA inclusion

13

has an impact on market value that *is* within the knowledge of reasonable certainty. ABS experts reasoned that it was.

The cases on which Central Terminals relies in arguing that ABS's "with LID" market value was too speculative are unpersuasive. It relies on *In re Condemnation of West Marginal Way*, 112 Wash. 418, 422, 192 P. 961 (1920), in which the Supreme Court was presented with the objection by dwellers on an island in the Duwamish River who were assessed for the cost of constructing a roadway on the mainland shoreline. The premise for the island dwellers being benefited was the theory that a bridge would be constructed by the city across the river. *Id.* at 423. Yet, as the court observed, "nothing of this sort is planned, contemplated, or projected at the present time at either public or private expense; nor is there any assumption or assurance thereof in the reasonably near future." *Id.* at 421. The court distinguished that situation from potential uses that can be properly considered:

> It is true that in fixing the amount of an assessment, or in determining if there would be a benefit to the property, the eminent domain commissioners *should take into consideration the present as well as the future use to which the property is reasonably adaptable*. Yet, the special and peculiar benefits which will legalize an assessment for the expense of a local improvement must be a present benefit immediately accruing from the construction of the work in question, and landowners cannot be assessed for intended benefits which may never be realized; mere speculative benefits are not, in reality, benefits.

*Id.* at 422 (emphasis added) (internal quotation marks and citation omitted).

14

Central Terminals also likens the determination of its benefit to the facts of *Jones*, in which lots in Tacoma owned by two homeowners whose properties were adequately served by an existing water main and hydrants challenged their inclusion on the assessment roll for a new water main and hydrant on an adjacent street. 52 Wn.2d at 144-45. They presented expert testimony, accepted by the trial court, that the project would do nothing to enhance the market value of three of their four lots. *Id.* at 145. This court affirmed the trial court's rejection of the city's "speculative," "conjure[d-]up" argument that "*if*" one of the homeowners moved his house to the rear of his tract, he "*might* build two houses on the front of the tract . . . and thus benefit." *Id.* at 147.

In this case, by contrast, Central Terminals' owners had themselves already petitioned for inclusion in Moses Lake's UGA and requested a rezone to UHI. The Port was presented with ABS's expert analysis that the project improvements would immediately improve their prospects for success to a "strong probability." CP at 399. Contrary to the superior court's finding, ABS's "with LID" valuation was not premised on the property as rezoned and included in the UGA; it merely took into consideration the impact on "investment hold" value of the significantly increased likelihood of those changes. This was information on which the commissioners were entitled to rely.

B.     Central Terminals offered no competing expert testimony

The Port finally argues that Central Terminals' failure to present any expert testimony prevents them from overcoming the presumption that ABS's assessment was correct and fair. "Expert evidence is clearly required to establish whether or not property is especially benefited by an improvement and the extent of the benefit." *Cammack*, 15 Wn. App. at 197; *see Bellevue Plaza*, 121 Wn.2d at 403; *City of Seattle v. Rogers Clothing for Men, Inc.*, 114 Wn.2d 213, 231, 787 P.2d 39 (1990). Central Terminals responds by pointing out that in *Hasit*, this court held that while the body approving the assessment roll will need expert analysis, there is no requirement that the *challenging party* present the evidence or that the expert evidence be "appraisal evidence." Br. of Resp't at 23 (quoting *Hasit*, 179 Wn. App. at 946); *see e.g.*, *In re Indian Trail Trunk Sewer Sys.*, 35 Wn. App. 840, 843-44, 670 P.2d 675 (1983) (burden of proof was met by expert testimony as to property near the challengers' property). Central Terminals contends that it satisfied this requirement for expert analysis by relying on ABS's comparable sales research into the RR1-zoned properties as the appropriate "with LID" value of its property.

The material conclusion to which Central Terminals was objecting, however, was not the value of RR1-zoned property with little potential of being included in the UGA and rezoned UHI. It was ABS's conclusions that (1) with the project, Central Terminals' property had a strong probability of being rezoned and included in the UGA, and (2) even

16

after taking into consideration the cost and risk of obtaining the rezone, that strong probability materially increased the "with LID" value of its property. Central Terminals needed to present competing expert analysis on these matters to overcome the presumption that the assessment of its property was correct and fair. It offered none.

We reverse the superior court's "Order on Appeal of LID Assessment Roll"[3] and confirm the final assessment roll as it relates to Central Terminals' properties.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.

---

[3] CP at 819.

17