IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SHG GARAGE SPE; SHG RETAIL SPE; SHG HOTEL SPE, LLC; SOUND VISTA PROPERTIES, LLC; ELLIOTT NE LLC; LOT B, LLC; MADISON HOTEL LLC; HEDREEN, LLC; HEDREEN HOTEL LLC; 7TH & PINE LLC; ASHFORD SEATTLE WATERFRONT LP; EQR-HARBOR STEPS, LLC (SE); EQR-HARBOR STEPS, LLC (NE); EQR-HARBOR STEPS, LLC (NW); EQR-SECOND & PINE, LLC; RRRR INVESTMENTS (UNIT 3802); UNITED WAY OF KING COUNTY; and VICTOR and MARY MOSES,<br><br>                  Respondents,<br><br>EQR-HARBOR STEPS, LLC (SW); and RRRR INVESTMENTS (UNIT 3800),<br><br>                  Plaintiffs,<br><br>        v.<br><br>CITY OF SEATTLE,<br><br>                  Appellant. | No. 85147-1-I<br><br>DIVISION ONE<br><br><br>ORDER GRANTING MOTION TO PUBLISH, WITHDRAWING OPINION, AND SUBSTITUTING OPINION |

Appellant City of Seattle moved to publish the opinion filed on April 22, 2024. Respondents have filed an answer. A panel of the court has reconsidered its prior determination not to publish the opinion for the above entitled matter and has found that it is of precedential value and should be published.

Now, therefore it is hereby

ORDERED that the unpublished opinion filed on April 22, 2024, is withdrawn; and it is further

ORDERED that a substitute published opinion be filed.

_Smith, C.J._

_Chung, J._          _Hazelrigg, A.C.J_

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SHG GARAGE SPE; SHG RETAIL SPE; SHG HOTEL SPE, LLC; SOUND VISTA PROPERTIES, LLC; ELLIOTT NE LLC; LOT B, LLC; MADISON HOTEL LLC; HEDREEN, LLC; HEDREEN HOTEL LLC; 7TH & PINE LLC; ASHFORD SEATTLE WATERFRONT LP; EQR-HARBOR STEPS, LLC (SE); EQR-HARBOR STEPS, LLC (NE); EQR-HARBOR STEPS, LLC (NW); EQR-SECOND & PINE, LLC; RRRR INVESTMENTS (UNIT 3802); UNITED WAY OF KING COUNTY; and VICTOR and MARY MOSES, | No. 85147-1-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |
| Respondents, | |
| EQR-HARBOR STEPS, LLC (SW); and RRRR INVESTMENTS (UNIT 3800), | |
| Plaintiffs, | |
| v. | |
| CITY OF SEATTLE, | |
| Appellant. | |

SMITH, C.J. — Washington statutes give municipalities the authority to make local improvements and fund those local improvements, in part, through assessments to property owners who obtain a special benefit from such improvements. The City of Seattle initiated a major, multiyear project to rebuild and transform its central waterfront. The City now appeals a superior court

decision which annulled the Seattle City Council's confirmation of a local improvement district assessment levied against property owners to help fund that project. We hold that the superior court erred in determining that the assessments were founded on a fundamentally wrong basis and that they were arbitrary and capricious. Accordingly, we reverse.

FACTS

In January 2019, the Seattle City Council created Local Improvement District (LID) No. 6751 to partially fund six major improvements to the downtown waterfront by assessing some costs of the improvements on the owners of 6,238 parcels in the downtown area. The six LID improvements are:

1. The Promenade: A continuous public open space extending along the west side of Alaskan Way from King Street to Pine Street;

2. The Overlook Walk: An elevated pedestrian bridge at the end of the Pike Street and Pine Street corridor that would connect Pike Place Market and the waterfront;

3. Pioneer Square Street Improvements: Includes streetscape, roadway, and sidewalk improvements to portions of South Main Street, South Washington Street, Yesler Way, and South King Street. These improvements would create pedestrian-friendly links between Pioneer Square and the waterfront.

4. Union Street Pedestrian Connection: An accessible pedestrian link between the new waterfront and Western Avenue.

2

5. Pike/Pine Streetscape Improvements: Pedestrian improvements along Pike Street and Pine Street between First Avenue and Ninth Avenue. These improvements will also provide enhanced pedestrian access to and from Pike Place Market and the waterfront.

6. Pier 58 (formerly known as the Waterfront Park): A rebuilt pier park located at the base of Union Street for social gatherings and performances.

The City Council limited the total amount of assessment to affected property owners to no more than $160 million plus the amount necessary to pay the costs of financing.

Calculation of Assessments Based on Special Benefit Study

In January 2019, the City commissioned ABS Valuation, Inc., (ABS) to estimate the increase in value accruing to each parcel due to the waterfront improvement projects, referred to as each parcel's "special benefit." ABS then allocated the cost of the projects among the LID parcel owners in proportion with those special benefits.

In November 2019, ABS submitted its final special benefit study to the City Council. Using mass appraisal techniques, market sales data, and lease data, ABS provided with- and without-LID values for each of the parcels based on "highest and best use" and market value of the affected properties. Although the study provided a general overview of ABS's reasonings and analyses, it did not include the specific calculations used to arrive at the estimated values.

Using a valuation date of October 1, 2019, ABS determined that the total special benefit estimate for all the LID parcels was $447,908,000. Then, to calculate the recommended assessments, ABS divided the total assessment limit by the estimated total special benefit to reach a cost/benefit ratio of 39.2 percent. ABS then multiplied the special benefit assessable to each parcel by the cost/benefit ratio to determine the recommended final assessment for each parcel.

<u>Hearings Before the Hearing Examiner</u>

In December 2019, the City Council published and mailed notices of a public hearing for the final LID assessment roll to all property owners within the LID. The notices identified each property owner's final assessment and provided information on how to object to the assessment. Of the 6,238 properties assessed, 430 property owners submitted timely objections. The City Council designated the City of Seattle Office of Hearing Examiner to conduct the hearings and provide a recommendation to the City Council.

The appeal hearings began in February 2020, soon after the onset of the COVID-19 pandemic. The objecting property owners presented their cases-in-chief before the Hearing Examiner over the course of several days in March and April 2020. In June 2020, the City presented its case-in-chief and the objecting property owners were permitted to cross-examine the City's witnesses. In lieu of additional live testimony, the City also submitted declarations; qualifying objectors were then permitted to submit closing briefs and responsive declarations.

In September 2020, the Hearing Examiner issued its initial findings and recommendations to the City Council. Of the 430 objecting property owners, the Hearing Examiner recommended remanding 17 properties for further analysis by ABS. On remand, the objecting property owners and the City submitted supplemental declarations and briefing for the remanded properties. After ABS revised its analysis, it reduced the assessments for 15 of the 17 remanded properties.

In February 2021, the Hearing Examiner submitted its final findings and recommendations with the city clerk, recommending that the City Council accept the revised assessments for the 15 remanded properties and deny all the property owners' objections.

<u>Confirmation of the Assessment Roll</u>

After the Hearing Examiner issued its final report, several property owners appealed the initial and final reports with the city clerk. The City Council delegated review of the appeals to its Public Assets and Native Communities Committee and set dates for hearing the appeals.

After considering the property owners' written submissions on appeal, the Committee voted to recommend that the full City Council deny all the appeals. The Committee did not discuss any of the individual appeals, nor any of the common issues affecting the property owners.

On June 14, 2021, the full City Council confirmed the final LID assessment roll and adopted the Hearing Examiner's final findings and recommendations, which rejected all of the property owners' appeals.

Appeal to the Superior Court

Twenty-one property owners (Owners) appealed their assessments to King County Superior Court. After a hearing on the appeals, the superior court nullified the LID assessments for each of the Owners' properties and ordered the City to refund all assessments the appealing owners had paid to date. The court concluded that the City's method of assessment was founded on a fundamentally wrong basis because it failed to consider the impacts of COVID-19, failed to demonstrate how removal of the viaduct impacted property values, failed to comply with professional appraisal standards, and failed to connect any value increase to any property-specific data. The court also concluded that the City's process for assessing the Owners' property was arbitrary and capricious because the City instructed its appraiser to hypothesize values too far in advance of completion of the projects, because the City instructed the appraiser to treat all the improvements as continuous, because the Hearing Examiner mistakenly disregarded credible testimony from the Owners' witnesses, and because the City Council failed to independently review the Hearing Examiner's recommendations.

The City appeals.

ANALYSIS

Because this case involves a complex and specialized area of law, we begin with a brief overview of the principles governing LID assessments before turning to the parties' arguments on appeal.

<u>LID Assessments in Washington</u>

Local governments may impose special assessments on property owners within a local improvement district to pay for improvements that specially benefit those properties. <u>Hamilton Corner I, LLC v. City of Napavine</u>, 200 Wn. App. 258, 266, 402 P.3d 368 (2017). A "special benefit[]" is "the increase in fair market value attributable to the local improvements." <u>Doolittle v. City of Everett</u>, 114 Wn.2d 88, 103, 786 P.2d 253 (1990). "Fair market value 'means neither a panic price, auction value, speculative value, nor a value fixed by depressed or inflated prices.' " <u>Bellevue Plaza, Inc. v. City of Bellevue</u>, 121 Wn.2d 397, 403, 851 P.2d 662 (1993) (emphasis omitted) (quoting <u>In re Loc. Improvement No. 6097</u>, 52 Wn.2d 330, 333, 324 P.2d 1078 (1958)). "To be subject to an LID assessment, a property must realize a benefit that is 'actual, physical and material[,] . . . not merely speculative or conjectural,' . . . that is 'substantially more intense than [the benefit] to the rest of the municipality.' " <u>Hasit LLC v. City of Edgewood</u>, 179 Wn. App. 917, 933, 320 P.3d 163 (2014) (alterations in original) (quoting <u>Heavens v. King County Rural Library Dist.</u>, 66 Wn.2d 558, 563, 404 P.2d 453 (1965)). And "a special assessment may not substantially exceed a property's special benefit." <u>Hasit</u>, 179 Wn. App. at 933. Moreover, a property should not be assessed "proportionately more than its share" of the total assessment relative to other properties in the LID. <u>Cammack v. City of Port Angeles</u>, 15 Wn. App. 188, 196, 548 P.2d 571 (1976).

Affected owners have the right to a hearing addressing whether the improvement resulted in a special benefit to their property. <u>Carlisle v. Columbia</u>

7

Irrig. Dist., 168 Wn.2d 555, 569, 229 P.3d 761 (2010). A city council may designate an officer to conduct hearings on the proposed assessments. RCW 35.44.070. The designated officer considers the evidence and the submitted objections and makes a recommendation to the city council. RCW 35.44.070. The city council, sitting as a board of equalization, may then adopt or reject the officer's recommendation. RCW 35.44.070, RCW 35.44.080(2). The city council may also revise or modify the assessment recommendation or order the assessment to be made de novo. RCW 35.44.080(3).

A city council's decision may be appealed to the superior court. RCW 35.44.200. The superior court shall confirm the city council's decision unless it finds "from the evidence that such assessment is founded upon a fundamentally wrong basis and/or the decision of the council or other legislative body thereon was arbitrary or capricious."[1] RCW 35.44.250. An assessment is founded on a fundamentally wrong basis if there exists " 'some error in the method of assessment or in the procedures used by the municipality, the nature of which is so fundamental as to necessitate a nullification of the entire LID, as opposed to a modification of the assessments as to particular property.' " Abbenhaus v. City of Yakima, 89 Wn.2d 855, 859, 576 P.2d 888 (1978) (quoting Cammack, 15 Wn. App. at 196). A city council's decision regarding a LID assessment is arbitrary and capricious if it constitutes "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances

---

[1] If the superior court determines that the assessment is invalid, the city may reassess the assessments. RCW 35.44.280.

surrounding the action." Abbenhaus, 89 Wn.2d at 858. And "[w]here there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." Abbenhaus, 89 Wn.2d at 858-59.

### Standard of Review

On appeal, our review is limited to the record of proceedings before the city council. Abbenhaus, 89 Wn.2d at 859. We examine the propriety of the process and do not undertake an independent evaluation of the merits. Doolittle, 114 Wn.2d at 93. In reviewing the council's decision, we apply the same "fundamentally wrong basis" and "arbitrary and capricious" standards of review. Hamilton Corner I, 200 Wn. App. at 267.

We presume that the city council's assessment was proper, and the challenging party bears the burden of proving otherwise. Bellevue Assocs. v. City of Bellevue, 108 Wn.2d 671, 674, 741 P.2d 993 (1987). We also presume (1) that an improvement is a benefit, (2) that an assessment is no greater than the benefit conferred, (3) that an assessment is equal or ratable to an assessment on other similarly situated property, and (4) that the assessment is fair. Abbenhaus, 89 Wn.2d at 861. However, these presumptions merely " 'establish which party has the burden of going forward with evidence.' " Hasit, 179 Wn. App. at 935 (quoting Bellevue Plaza, 121 Wn.2d at 403). If " 'the other party adduces credible evidence to the contrary,' the burden shifts to the city" to support its assessments. Hasit, 179 Wn. App. at 935-36 (quoting Bellevue Plaza, 121 Wn.2d at 403). "[C]laims of unfairness made before the city council,

9

without supporting evidence of appraisal values and benefits, are inadequate to overcome these presumptions of fairness and appearance of correctness." Abbenhaus, 89 Wn.2d at 861.

As an initial matter, we note that the Owners misquote two legal principles. First, citing Heavens, the Owners state that "LID assessments must . . . not exceed the actual special benefit accruing to each property as a result of the LID improvements." This is incorrect. Instead, the LID assessment must not *substantially* exceed the special benefit accruing to a property. Hasit, 179 Wn. App. at 933; Heavens, 66 Wn.2d at 563. Second, quoting Bellevue Associates, the Owners state that the fundamentally wrong basis standard refers to " 'some error in the method of assessment or in the procedures used by the municipality[.]' " But this selective citation omits the second half of that sentence, which elaborates: " 'the nature of which is so fundamental as to necessitate a nullification of the entire LID, as opposed to a modification of the assessment as to a particular property.' " Bellevue Assocs., 108 Wn.2d at 675 (emphasis omitted) (quoting Abbenhaus, 89 Wn.2d at 859).

### Expert Appraisal Evidence

The parties dispute whether the Owners' expert testimony before the Hearing Examiner qualifies as expert appraisal evidence sufficient to overcome the presumption that the City's assessment was valid. Although testimony from expert appraisers does qualify as expert appraisal evidence, the Owners' evidence did not demonstrate that the properties did not benefit from the improvements and was thus insufficient to overcome the presumption of validity.

To overcome the presumption that a LID improvement is a benefit, a challenging party must present "expert appraisal evidence showing that the property would *not* be benefited by the improvement." Bellevue Plaza, 121 Wn.2d at 403. For example, in In re Indian Trail Trunk Sewer System, expert testimony from the property owners' appraisers "regarding fair market value of their assessed property" showing that the land was not affected by the improvements and that the improvements "had an adverse effect upon the value of the land" was sufficient to rebut the presumption in favor of validity. 35 Wn. App. 840, 842-43, 670 P.2d 675 (1983). Likewise, in In re Consolidated Appeals of Jones, expert testimony "that the improvements did not enhance the market value of [the owners'] properties" was adequate to rebut the presumption of validity. 52 Wn.2d 143, 145, 324 P.2d 259 (1958).

Here, the Owners do not contend that their properties would not be specially benefitted, nor did they provide evidence demonstrating as much. Instead, the Owners allege that testimony before the Hearing Examiner provided "sufficient information to calculate an alternative special benefit amount." At the same time, however, the Owners also contend that "the LID study and the potential benefit estimates are simply too speculative to allow for a reliable counter-appraisal." Because the Owners have not provided expert evidence demonstrating that their properties would not be specially benefitted, the Owners have not overcome the presumption of validity.

<u>Fundamentally Wrong Basis</u>

The Owners contend that the City's appraisal was founded on a fundamentally wrong basis for four reasons: (1) ABS's study did not analyze how removal of the viaduct affected property values; (2) the study's assumptions were rendered inaccurate by COVID-19; (3) the study did not comply with professional appraisal standards; and (4) the study did not conduct any property-specific analysis.  We disagree.

Because "fundamentally wrong basis" is less well-defined by case law, a few examples of instances in which LID assessments were determined to be founded on fundamentally wrong bases are provided before we address the Owners' arguments.

In <u>In re Shilshole Avenue</u>, our Supreme Court invalidated an assessment levied for the purpose of raising the grade of the road by 16 to 18 feet because the evidence demonstrated that the properties would have equally benefited from an increase of only nine feet.  85 Wash. 522, 525, 148 P. 781 (1915).  The court noted that assessments for the portion of the project that raised the street more than nine feet were "made against the property of these appellants to pay damages for a thing which did not benefit that property, [were] founded upon a fundamentally wrong basis and [were] wholly indefensible."  <u>Shilshole Ave.</u>, 85 Wash. at 536.

Similarly, in <u>Doolittle</u>, the court determined that an assessment was founded on a fundamentally wrong basis where the city appraised and assessed four adjacent properties as a single tract of land, concluding that the highest and

best use of the properties would be a single large commercial building covering all four lots. 144 Wn.2d at 91-92. At the time of the appraisal, a single commercial property occupied three of the lots and the fourth had been developed for a separate commercial use. Doolittle, 144 Wn.2d at 90. On appeal, our Supreme Court reasoned that because the fourth lot was never used in combination with the other lots, it was an error for the appraiser to disregard the owner's actual use and consider the lots as a single unified parcel. Doolittle, 144 Wn.2d at 103.

More recently, in Hasit, this court determined that an assessment was founded on a fundamentally wrong basis because it included costs for "oversizing" the sewer pipes, which would only benefit future users not assessed under the LID. 179 Wn. App. at 938. In that case, the record showed that the city deliberately built the pipes larger than necessary to serve the LID because it wanted to be able to serve future users outside of the LID. Hasit, 179 Wn. App. at 940. The city also rejected other financing options to fund the expansion in favor of having the LID owners pay for the larger pipes. Hasit, 179 Wn. App. at 940-41. On appeal, this court explained that the city could not assess owners for improvements that did not provide a special benefit. Hasit, 179 Wn. App. at 941.

### 1. Viaduct Removal

The Owners claim that the LID assessments were founded on a fundamentally wrong basis because ABS's study did not analyze how the viaduct removal impacted property values by the waterfront. Because the Owners provided no evidence refuting ABS's "before" valuation, we disagree.

A primary assumption of the ABS study was "that in the before (without LID) scenario, the Alaskan Way viaduct has been removed and Alaskan Way is rebuilt, to WSDOT standards, at street level." Therefore, "any view amenity enhancement created by removal of the viaduct [was] not considered in [ABS's] analysis." But the study and the record contain adequate information for the Owners to evaluate how ABS valued the "before" scenario. Robert Macaulay, ABS's lead appraiser, testified that to appraise the "before" scenario, ABS relied on renderings of the rebuilt Alaskan Way and considered factors such as proximity to the improvements, relevant market information on rents and vacancy, market conditions, and capitalization rates. In response, the Owners claim that the ABS's analysis is unreliable but do not proffer any evidence regarding the value of their properties before and after the improvements. Because the Owners fail to provide any relevant evidence to rebut the presumption that the City's assessment was proper, the assessments were not founded on a fundamentally wrong basis.

2. Impact of COVID-19

The Owners argue that all assumptions in the ABS study were rendered false by COVID-19 and therefore, the assessments were founded on a fundamentally wrong basis. Because the assessments predate the onset of the pandemic, we disagree.

Though the Owners assert that it is contrary to law to ignore the impacts of COVID-19, they present no authority to support their contention that the pandemic invalidated any and all assumptions in ABS's study. On the contrary,

settled case law provides that fair market value " 'means neither a *panic price*, auction value, speculative value, *nor a value fixed by depressed* or inflated prices.' " Bellevue Plaza, 121 Wn.2d at 404 (emphasis added) (quoting Loc. Improvement No. 6097, 52 Wn.2d at 333). Here, the Owners have not shown that COVID-19 impacted the values of their properties or that these hypothetical reductions are not merely a "panic price." The Owners merely allege that ignoring the effect of COVID-19 is "unfair."

Moreover, before the Hearing Examiner, the Owners' own expert acknowledged that the Appraisal Institute's guidance on conducting appraisals during the pandemic did not apply to appraisals done before the onset of the pandemic. The Owners fail to demonstrate that the ABS study needed to account for value changes due to COVID-19; this is not a basis on which to conclude that the assessments were founded on a fundamentally wrong basis.

3. Professional Appraisal Standards

The Owners also contend that the assessments were founded on a fundamentally wrong basis because the ABS study did not comply with professional appraisal standards. We disagree.

The Owners first argue that the study did not comply with Uniform Standards of Professional Appraisal Practice[2] (USPAP) Standards 1 and 2, which govern direct property appraisals. Because the appraisal at issue was a

---

[2] APPRAISAL FOUND., UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE & ADVISORY OPINIONS (USPAP). Washington has adopted the USPAP as the standard of practice governing real estate appraisal activities. WAC 308-125-200(1).

mass appraisal, which is governed by separate standards, and not a direct appraisal, it is unclear why compliance with Standards 1 and 2 is necessary.

Next, the Owners assert that the study did not comply with USPAP Standards 5 and 6, which govern mass appraisals. Specifically, Standard 5 covers development of a mass appraisal while Standard 6 addresses the content and level of information required in a mass appraisal report. Standard 5 requires that an appraiser "employ recognized techniques for specifying property valuation models" and "employ recognized techniques for calibrating mass appraisal models." The comment to Standards Rule 5-4(b) explains that

> [t]he formal development of a model in a statement or equation is called model specification. Mass appraisers must develop mathematical models that, with reasonable accuracy, represent the relationship between property value and supply and demand factors, as represented by quantitative and qualitative property characteristics. The models may be specified using the cost, sales comparison, or income approaches to value. The specification format may be tabular, mathematical, linear, nonlinear, or any other structure suitable for representing the observable property characteristics.

Standard 6 requires that mass appraisal reports "summarize and support the model specification(s) considered, data requirements, and the model(s) chosen; provide sufficient information to enable the client and intended users to have confidence that the process and procedures used conform to accepted methods and result in credible value conclusions; and include a summary of the rationale for each model, the calibration techniques to be used, and the performance measures to be used." Standard 6 also requires a mass appraisal report to "summarize calibration methods considered and chosen, including the

mathematical form of the final model(s)." Because ABS's study is a report on a mass appraisal to determine special benefits, Standard 6 provides the relevant guidelines.

Here, the ABS study and Macaulay's testimony before the Hearing Examiner demonstrate that the study complied with Standard 6. The study's methodology section states that the appraiser considered recent sales of comparable commercial and multifamily residential land, local commercial and apartment lease rates, and supply and demand information for commercial and residential markets, such as vacancy rates and absorption costs for estimating before and after values. The appraiser also interviewed developers of proposed and underway projects in the LID vicinity to obtain perspective on the LID improvements and its influence on property values. The study then explains how it calculated a cost/benefit ratio by dividing the total assessment cap by the total estimated special benefit assessable to the properties.

The study details in over 140 pages how special benefits were calculated for commercial, residential, and special purposes properties by analyzing comparable projects and relevant market data. To assess before and after values, the study considered supply and demand factors, vacancy and occupancy rates, capitalization rates, and market conditions. The study categorizes properties by use (commercial, residential, and special purpose) and applies different valuation methods (income based, sales comparison, or cost) based on the type of property. The study notes that many increases in property values are because of the "enhanced location, pedestrian connectivity and

appeal created by the waterfront improvement amenities," which are reflected in increased rents, lower vacancy levels and capitalization rates, and lower perceived investment risk. The study uses data from commercial market data research services, public records, individual buyers and sellers, local realtors, and developers and area property managers. The study's addenda contain many pages of graphs summarizing this data.

Before the Hearing Examiner, Macaulay testified that ABS calculated before and after values by "looking at other studies [ABS] had done, looking at other cities and how . . . the market reflected change due to the implementation of projects similar to [the Waterfront LID]." Macaulay also testified that ABS analyzed over 25 studies throughout different market areas relative to streetscapes, bike lanes, open spaces, and parks. Macaulay noted that contrary to the Owners' assertion, ABS "didn't look at the whole LID area as one giant park." Macaulay also explained that the study does not specify how much each factor contributed to value increases because "[t]he market just doesn't function that way" and ABS was "trying to reflect the market as it functions." During the proceedings, ABS also produced spreadsheets for each of the Owners' properties that showed detailed before and after valuations.

Because ABS complied with applicable USPAP standards and because the Owners fail to present additional evidence showing that the valuations were inaccurate, the assessments were not founded on a fundamentally wrong basis.

18

4. Property-Specific Analysis

The Owners contend that ABS's "hypothesized micro-benefits are neither reasonably measurable nor a legal basis to assess property owners." In doing so, they repeat much of their previous arguments and are not persuasive. As noted, ABS adequately documented and explained its before and after valuations. And because ABS conducted a mass appraisal, as opposed to a direct appraisal, it was not required to produce the type of detailed, property-specific analysis that the Owners seek. Again, without evidence from the Owners showing that the percentage increases are inaccurate, the Owners cannot overcome the presumption that the City's assessment was accurate. The study's lack of unnecessary property-specific analysis does not render the assessments invalid.

Finally, we briefly note that while the Owners asserted in briefing that ABS miscalculated the special benefit, they maintained at oral argument that there was no special benefit to any of their properties.[3] No evidence exists in the record to support this argument, and the Owners do not provide any explanation for it in their briefing.

## Arbitrary and Capricious

The Owners contend that the City's process was arbitrary and capricious for four reasons: (1) the City instructed ABS to hypothesize values too far in

---

[3] Wash. Ct. of Appeals oral argument, SHG Garage SPE v. City of Seattle, No. 85147-1-I (Feb. 27, 2024), at 11 min., 33 sec. through 11 min., 50 sec., audio recording by TVW, Washington State's Public Affairs Network, http://www.tvw.org (Council for Respondent Owners: "The Respondents are absolutely challenging whether there is a special benefit.").

advance; (2) the City instructed ABS to treat all improvements as continuous when they were not; (3) the Hearing Examiner misapplied the presumption of correctness to disregard testimony from the Owners' witnesses; and (4) the City Council failed to independently review the Hearing Examiner's recommendations. We disagree.

    1.  <u>Timing of Appraisal</u>

The Owners first contend that the 2019 appraisal was completed too far in advance of the LID improvements. In support of this assertion, the Owners rely exclusively on a section of the Washington Local and Road Improvement Districts Manual (LID Manual),[4] which states that market value is estimated "typically as of the date of the final assessment roll hearing," and Seattle Municipal Code (SMC) § 20.04.070(B)(1), which requires the proposed final assessment roll to be filed within 90 days following completion of the improvements.

But neither the LID Manual nor the SMC provide clear requirements for when an appraisal date must be set. The LID Manual only describes what "typically" happens in a final special benefit study—it does not set hard and fast rules for how special benefits must be measured. And the Owners provide no authority to suggest that the LID Manual is binding upon the City or its appraiser. The Owners' reliance on SMC § 20.04.070(B)(1) is similarly unpersuasive as it

---

[4] MUN. RSCH. & SERVS. CTR., LOCAL AND ROAD IMPROVEMENT DISTRICTS (LID) MANUAL FOR WASHINGTON STATE ch. 5, at 55 (6th ed. 2009) https://mrsc.org/getmedia/4233f39b-f38b-4766-8c22-a0f0d9340d91/Local-And-Road-Improvement-Districts-Manual.pdf.aspx?ext=.pdf [https://perma.cc/XE7L-6X8W].

only addresses when the proposed final assessment roll must be *filed*, not when the appraisal date must be set.

Citing Bellevue Associates, the Owners asserted at oral argument that a property valuation must be conducted immediately before and after the special benefits attach.[5] But this is a mischaracterization of Bellevue Associates. In that case, our Supreme Court stated that "[t]he measure of special benefits is 'the difference between the fair market value of the property *immediately after* the special benefits have attached and its fair market value before they have attached.' " Bellevue Assocs., 108 Wn.2d at 675 (emphasis added) (quoting Heavens, 66 Wn.2d at 564). The immediacy requirement that the Owners mention applies only to the valuation of the property *after* the special benefits have attached, not before. The Owners offer no other argument suggesting that the time between the appraisal and the completion of the LID improvements rendered the valuations inaccurate.

2. Continuous Improvements

The Owners next argue that the City acted arbitrarily and capriciously by instructing ABS to treat the separate LID improvements as one continuous improvement. Because the City complied with the applicable statutes governing continuous and contiguous improvements, we disagree.

RCW 35.42.050 requires a city council to assess discontinuous improvements separately unless it makes a finding that all properties within the

_____

[5] Wash. Ct. of Appeals oral argument, supra, at 10 min., 40 sec. through 10 min., 50 sec.

LID will benefit from the improvements as a whole.  Here, the City Council made such a finding in Ordinance 125760:[6]  "It is hereby found that the [LID] boundaries embrace as nearly as practicable all the property specially benefited by the LID Improvements."  Because the City complied with RCW 35.42.050, its actions were not arbitrary and capricious.

### 3. Presumption of Correctness

The Owners also claim that the Hearing Examiner misapplied the presumption of correctness to disregard testimony from Owners' expert witnesses.  But as previously noted, "[w]here there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous."  Abbenhaus, 89 Wn.2d at 858-59.  Similarly, here, the Hearing Examiner's weighing of evidence is not arbitrary and capricious merely because the Owners disagree with how the Examiner weighed the evidence.  Absent any authority or evidence to the contrary, the record reflects that the Hearing Examiner considered the evidence before it and determined that the City's evidence was more persuasive than the Owners' evidence.

### 4. City Council Review of Hearing Examiner's Recommendations

Finally, the Owners maintain that the City Council has a duty to independently review the appeals and that it failed to do so.  But the record

---

[6] Seattle Ordinance 125760, at 5 (Jan. 28, 2019), https://clerk.seattle.gov/~archives/Ordinances/Ord125760.pdf [https://perma.cc/38HR-C4ER].

reflects that the City Council appropriately delegated review of the appeals to a committee as authorized by law.

The City Council may direct any appeals from any finding, recommendation, or decision of the hearing examiner to a committee of the City Council. SMC § 20.04.090(C). If the City Council chooses to delegate hearing the appeals to a committee, it does not need to independently review the appeals. SMC § 20.04.090(E) (city council *or* committee conducts review on appeal).

Here, the City Council chose to delegate hearing of the appeals to the Public Assets and Native Communities Committee. After considering the appeals, the Committee voted to recommend denying the appeals to the full City Council. The Owners' assertion that the City Council, sitting as a board of equalization, has a duty to independently review the appeals is unpersuasive. In support of this contention, the Owners cite SMC § 20.04.070(A), which provides that "[a]t the time fixed for the hearing [on the final assessment roll], the City Council, a committee thereof, the Hearing Examiner, or designated officer shall sit as a Board of Equalization for the purpose of considering the assessment roll." Because SMC § 20.04.070(A) addresses hearings on the final assessment roll and not appeals, it is unpersuasive. Moreover, it still permits a committee of City Council to sit as a board of equalization. Here, the City Council did not need to independently review the appeals and delegation to the Committee was appropriate.

The Owners also contend that certain comments by council members suggest that the Committee and City Council did not properly review the appeals. This is also unpersuasive because "comments and alleged motives of council members do not transmute the City's actions into arbitrary and capricious conduct." Hasit, 179 Wn. App. at 951. We hold that the City's LID assessments were not calculated on a fundamentally wrong basis and that the City Council did not act arbitrarily or capriciously in adopting the LID assessments.

We reverse.

_Smith, C.J._

WE CONCUR:

_Chung, J._    _Hazelrigg, A.C.J_